CONCURRING OPINION BY
TAMILIA, J.:
¶ 1 I vote to join the majority memorandum but write separately to provide a more specific delineation as to what the trial court must consider in preparing a record upon remand to meet the directions of this Court for a thorough review of the evidence leading to a determination of the best interest of the child regarding visitation. While I am deeply concerned that we are directing removal of the stay placed by the court on visitation before a determination of best interest has been established, I cannot quarrel with the procedure for moving into an exploration of the viability of visitation as proposed in our decision. My other concerns have to do with an adequate exploration of best interest and the aspects of that review which are mandated by our law and standards applicable to this class of case. These will be detailed as I proceed through evaluation of the record and briefs now before us.
¶ 2 As a preface to my review of the briefs and the current, inadequate record, I believe it is helpful to outline the factors which provide a matrix for defining the child’s best interest. An important standard in this regard is that promulgated under the Uniform Marriage and Divorce Act (UMDA) which provides, in pertinent part:
UNIFORM MARRIAGE AND DIVORCE ACT (as Amended 1973)
Section 402. [Best Interest of Child.]
The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:
(1) the wishes of the child’s parent or parents as to his custody;
(2) the wishes of the child as to his custodian;
(3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child’s best interest;
(4) the child’s adjustment to his home, school, and community; and
*42 (5) the mental and physical health of all individuals involved.
The court shall not consider conduct of a proposed custodian that does not affect his relationship to the child.
A caveat to (5) would be that any person or persons who would be present during custody or visitation should be evaluated to determine the possible effect on his/her relationship.
Section 407. [Visitation.]
(a) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child’s physical, mental, moral, or emotional health.
(b) The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent’s visitation rights unless it finds that the visitation would endanger seriously the child’s physical, mental, moral, or emotional health.
Section 408. [Judicial Supervision.]
(a) Except as otherwise agreed by the parties in writing at the time of the custody decree, the custodian may determine the child’s upbringing, including his education, health care, and religious training, unless the court after hearing, finds, upon motion by the noncustodial parent, that in the absence of a specific limitation of the custodian’s authority, the child’s physical health would be endangered or his emotional development significantly impaired.
(b) If both parents or all contestants agree to the order, or if the court finds that in the absence of the order the child’s physical health would be endangered or his emotional development significantly impaired, the court may order the [local probation or welfare department, or court social service agency] to exercise continuing supervision over the case to assure that the custodial or visitation terms of the decree are carried out.
¶ 3 Despite application of the criteria promulgated under the UMDA, the almost unassailable discretion on the part of the trial judge in weighing the evidence and determining credibility and the impact of expert testimony is still the most critical factor in determining the outcome of these cases. In Beers v. Beers, 342 Pa.Super. 465, 493 A.2d 116, 117-118 (1985), this Court stated “[t]he polestar of any child custody [or visitation] dispute is to reach a decision which serves the ‘best interests’ of the child. Factors to be considered in arriving at such a determination include the child’s physical, intellectual, emotional and spiritual well being.” Id. (citations omitted). See also Hughes v. Hughes, 316 Pa.Super. 505, 463 A.2d 478 (1983); Haraschak v. Haraschak, 268 Pa.Super. 173, 407 A.2d 886 (1979).
¶ 4 Other considerations are specified in Section 5303, Award of custody, partial custody or visitation, of the Domestic Relations Code, 23 Pa.C.S.A. § 101, et. seq. In relevant part that section provides:
(a) General rule.—
(1) ... the court shall consider the preference of the child as well as any other factor which legitimately impact the child’s physical, intellectual and emotional well being.
(2) ... the court shall consider ... among other factors, which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the noncustodial parent and the child.
*43 (3) ... consider each parent and adult household member’s present and past violent or abusive conduct.
d) Sole custody. — The court shall award sole custody when it is in the best interest of the child.
23 Pa.C.S. § 5303. These provisions are the guides to a comprehensive review which must be followed by the trial judge in establishing a complete record and thereafter, applying his sense of the truthfulness, weight and impact of the evidence on the child’s present and future well being.
¶ 5 It appears from the record that the hearing officers adopted in toto appellant’s assertions that it would be in A.M.’s best interest to have “another person in her life that loves her and just the experience of the different things with another person besides her own family.” N.T., 5/19/03, at 90. This finding and parroting of T.B.’s expression unquestionably was inadequate and was properly rejected by Judge Leah-ey. Conversely, Judge Leahey, after his hearing de novo of the evidence by the parties and reviewing the psychological report by Dr. King, grasped the following statement in the report. “[I]f you strictly look at the best interest of this particular child, it is clear to me that denying visits would be in the best interest of the child. ” Trial Court Opinion, Leahey, J., 6/21/04, at 5 (emphasis by Judge Leahey) quoting Psychological Evaluation for Custody, 11/16/02, Mark King, PhD, at 10. Dr. King also made a coherent and persuasive analysis of what had transpired in this case which Judge Leahey acknowledged when he concluded:
Obviously, Dr. King, a respected psychologist, does not wish to reward Defendant for her conduct; neither do I. However, we must look strictly at the best interest of the child. I agree with Dr. King that denying visits is in the child’s best interest. I believe if we were to order visits, that defendant’s anger towards plaintiff, as Dr. King put it, will continue to ‘filter down’ to the child and, in my opinion, psychological damage to the child as a result of being placed in the middle of this conflict could easily result.
Trial Court Opinion, at 5-6.
¶ 6 It is beyond question that Dr. King and Judge Leahey derived appropriate conclusions from the testimony, observations and findings supported by the record. Having said this, it is not beyond requiring further exploration, analysis and judicial efforts to determine if there does not remain a path which can be opened to providing visitation while protecting the child’s best interest. That is not to say that upon pursuing further hearings and exposition of the child’s predicament in this matter, an ultimate conclusion, beyond a preponderance of the evidence, would militate against visitation, but it appears the majority is correct in pursuing a remand for that purpose.
117 Dr. King in his report is not evading the tenants of psychological principles nor is he ignoring the legal concept of best interest. As quoted by the trial court, he states “There is a number of social policy issues here that make it difficult to feel comfortable saying that these visits should not take place. One of these is the blatant alienation by the mother. All psychologists, especially this one, are loathed to reward such behavior...” Trial Court Opinion, at 5.
¶ 8 Pursuing the major tenets established by the UMDA and statutory and case law, which attempt to establish parameters for the core value pertinent to custody and visitation, the best interest of the child, each child and each case pres *44 ents a unique set of circumstances. Dr. King undoubtedly was aware of, and to some degree guided by, the concepts promulgated by the seminal works Before the Best Interests of the Child and Beyond the Best Interests of the Child.[6] The paramount goal these and most experts currently perceive is continuity in the child’s environment and permanence in its psychological attachments. This necessarily involves a substantial deviation of the claim of at least one of the parents (natural or psychological). “[T]he psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.” Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109, 112 (1978) quoting Beyond the Best Interests of the Child. To provide full effect to the tenets of psychiatric truth, i.e. continuity and relegating to the blood tie a mythological dimension — most courts attribute a basic cultural truth to blood ties and are reluctant to embrace the new “findings” in favor of biological strangers. In the legal tenets which guide our custody and visitation proceedings, the parents have constitutional rights, as should the child. McGaffin v. Roberts, 193 Conn. 393, 479 A.2d 176 (1984) (stating that in loco parentis status does not carry the same weight as does biological parentage but in some cases in loco parentis prevails.)
¶ 9 While no definitive constitutional weight has been attributed to the rights of the child in custody cases, it has been ascribed to the rights of children in juvenile cases. In re Gault, 387 U.S. 1, 87 5.Ct. 1428, 18 L.Ed.2d 527 (1967). Biological fathers, even those not members of the child’s home or family, retain rights in paternity, termination and adoption cases effecting their children. See Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
¶ 10 Perusing the significant, relevant focus of concerns in this case are the following:
1. Fitness and qualifications of the natural and in loco parents. This element was left largely unexplored, it being assumed throughout that both were competent in this regard. With regard to this aspect, the court should consider the family members, significant others, and others who, based upon the social circumstances, will likely interact with the child.
2. The wishes of the child’s parents as to custody and visitation. This factor has been explored. The extensive and somewhat bitter litigation, spanning many years, through several trial court and appellate proceedings, is testimony to the desire of the natural mother and appellant, the in loco parent, to have custody of, or at the very least, regular interaction with A.M. As with exploration of fitness and qualifications (# 1 above) the lifestyle and values of the in loco parent, as they comport with or conflict with the custodial parent, must be carefully scrutinized and evaluated as to their impact on the child. There is ample precedent that if grandparents have acquired in loco status and thereby have standing to pursue partial custody or visitation, behavior or activities of the grandparents which is conflicting or interfering with the natural parent’s reasonable rearing values and activity, can result in denial of visitation and/or partial custody.
*45 ¶ 11 In Beyond, the Best Interests of the Child, supra, the authors speak unfavorably about visitation stating:
In addition, certain conditions such as visitations may themselves be a source of discontinuity. Children have difficulty in relating positively to, profiting from, and maintaining the contact with two psychological parents who are not in positive contact with each other. Loyalty conflicts are common and normal under such conditions and may have devastating consequences by destroying the child’s positive relationships to both parents. A “visiting” or “visited” parent has little chance to serve as a true object for love, trust, and identification, since this role is based on his being available on an uninterrupted day-to-day basis.
Once it is determined who will be the custodial parent, it is that parent, not the court, who must decide under what conditions he or she wishes to raise the child. Thus, the noncustodial parent should have no legally enforceable right to visit the child, and the custodial parent should have the right to decide whether it is desirable for the child to have such visits.
Id. at 37-38.
¶ 12 3. The wishes of the child as to his custodian (visitation). This becomes an important inquiry as the child has been virtually uninvolved in interaction with T.B. and was uncomfortable with her on the occasion she was in her presence. There was meaningful co-parenting from A.M.’s birth on August 27, 1993, until T.B. left the lesbian relationship in the summer of 1996 to be with another woman. L.R.M. thereafter denied T.B. permission to see or be involved with A.M., on the basis that L.R.M. “was the only parent.” L.R.M. thereby alienated A.M. from T.B. During the intervening almost nine years, the case has been involved in bitter litigation to determine initially whether T.B. had standing, and thereafter to determine whether it would be in A.M.’s best interest to have visitation with T.B. Since visitation and/or custody are determined on the narrowest of legal standards between parties with equal right to the custody of a child (two natural parents or parents through adoption) which is preponderance of the evidence, the preference of the child becomes extremely important. Additionally, one of the few presumptions remaining in relation to child custody is that of the superior right of a natural parent over third parties, even those standing in loco parentis. See Charles v. Stehlik, 560 Pa. 334, 340, 744 A.2d 1255, 1258 (2000); Ellerbe v. Hooks, 490 Pa. 363, 416 A.2d 512 (Pa.1980).[7] Also, when in loco parentis is sought based upon co-parenting in the mother’s home, there is a question whether this can be established. Delegation of much of the day-to-day child care by a parent does not necessarily place the caretaker in loco parentis to the child where the parent continues to exercise control over the child’s care. See Argenio v. Fenton, 703 A.2d 1042 (Pa.Super.1997); Porch v. Porch, 327 Pa.Super. 346, 475 A.2d 831 (1984). The absence of any responsibility on T.B.’s part for the care of A.M. for almost nine years can only weaken the standing and reliance upon in loco paren-tis as the basis for the claim of right to *46 visitation, particularly in light of the child’s preference and the natural mother’s opposition to a renewal of the relationship. Likewise, in the three classes of relationships, 1) those between parents, 2) those between parent and state, and 3) those between parents and third parties, persons other than parents are treated as third parties for purposes of custody disputes, regardless of the degree of the relationship, although the relationship to the child is a factor to be considered by the court. In re Custody of Hernandez, 249 Pa.Super. 274, 376 A.2d 648 (1977). Thus, while T.B. has been granted standing to entertain a visitation action in regarding to A.M., this does not resolve the issues relating to best interest and the proof of those elements by a preponderance of the evidence. Finally, the age of the child, her maturity and the soundness of her reasons in favor of or against visitation are significant factors which the trial court must weigh carefully. A.M. is approaching the age where her preference becomes more compelling despite the reason leading up to the long distancing between her and T.B. In In re Seiferth, 309 N.Y. 80, 127 N.E.2d 820 (1955) and In re Green, 448 Pa. 338, 292 A.2d 387 (Pa.1972), the courts refused to authorize surgery which was not immediately life threatening when the children (Seiferth, age 14, and Green, age 16) refused surgery and the courts believed both were of an age that they should be heard.
¶ 13 Returning to the rationale of the experts who authored Beyond the Best Interests of the Child, it firmly and clearly sets forth the effect of presence or absence in the caretaking relationship as follows:
Whether any adult becomes the psychological parent of a child is based thus on day-to-day interaction, companionship, and shared experiences. The role can be fulfilled either by a biological parent or by an adoptive parent or by any other caring adult — but never by an absent, inactive adult, whatever his biological or legal relationship to the child may be.
Id., at 19. A final note from the analysis and recommendations of Beyond the Best Interests of the Child, which is generally unaccepted in legal or constitutional considerations, is as follows:
Once it is determined who will be the custodial parent [determined by agreement of the parties or by the court in contested cases] it is that parent, not the court, who must decide under what conditions he or she wishes to raise the child. Thus, the noncustodial parent should have no legally enforceable right to visit the child, and the custodial parent should have the right to decide whether it is desirable for the child to have such visits.10
10. [This concept is contained in The Civil Code of Japan (Supreme Court of Japan, Tokyo, Official English Translation, pp. 152-153 — Articles 818-821).]
Id., at 38.
¶ 14 Thus, it is evident there is a clear dichotomy between the principles which are deemed fundamental in dealing with contested custody/visitation cases through the courts as opposed to psychological/child parenting concepts. At best we can only hope to bridge the differences and in doing so apply the doctrine of the least detrimental available alternative. The authors of Beyond the Best Interests of the Child, in their “Provisions for a Model Child Placement Statute, ” describe this paradigm as follows:
The least detrimental available alternative is that child placement and procedure for child placement which maximizes, in accord with the child’ sense of time (which is based on the urgency of his or her instinctual and emotional *47 needs which differ from those of an adult) the child’s opportunity for being wanted and for maintaining on a continuous, unconditional and permanent basis, a relationship with at least one adult who is or will become the child’s psychological parent.
Id., at 99 ¶ 10.6. In a custody dispute, the intervenor, that is the adult seeking custody, must establish that he or she is the least detrimental available alternative. Id., at 100. While the above principles are stated differently than the best interest standards of the UMDA, they are not irreconcilable with them.
Standard regarding in loco parentis and natural parent
¶ 15 As between parents, after hearing evidence regarding best interest, a judge awards custody according to whether evidence scales tip to mother or father’s side. When the judge hears a dispute between parents and a third party, it is more complex. The question still is what is in child’s best interest, however, the parties do not start even — the parent has a prima facie right to custody, which will be forfeited only if “convincing reasons” appear that the child’s best interest will be served by an award to the third party. See Ellerbe, supra. Thus, even before the proceedings start, “the evidentiary scale is tipped, and tipped hard, to the parents’ side.” Hernandez, supra, at 654. What the judge must do, therefore, is first hear all the evidence relevant to the child’s best interest, and then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, then down on the third party’s side. Although there are two distinct categories of third parties — relative and non-relative — both types, must show “convincing reasons” why the natural parent should not have custody of the child. See Hernandez, at 655; Liebner v. Simcox, 834 A.2d 606 (Pa.Super.2003).
¶ 16 As to the application of Hernandez and Ellerbe to this case, this Court in J.A.L. v. E.P.H., 453 Pa.Super. 78, 682 A.2d 1314 (1996), adopted the use of the term “prima facie right to custody” in the context of a standing inquiry as between the right of a non-parent and that of a biological parent in determining custody or visitation rights. The J.A.L. Court stated,
In this latter context [determining custody as opposed to establishing standing] the natural parent’s ‘prima facie ’ right to custody has the effect of increasing the evidentiary burden on the non-parent seeking custody.” Hernandez and Ellerbe, supra. See Campbell v. Campbell, 448 Pa.Super. 640, 672 A.2d 835 (Pa.Super.1996) (natural mother confused principles of standing with standard to be applied in deciding custody dispute); Walkenstein v. Walkenstein, 443 Pa.Super. 683, 663 A.2d 178 (Pa.Super.1995) (same). Appropriate deference to the parent’s right to custody thus does not require that all third parties be denied standing, or even that standing rules be applied in an overly stringent manner; the increased burden of proof required of third parties seeking custody rights provides an additional layer of protection for the parent. See Kellogg v. Kellogg, 435 Pa.Super. 581, 646 A.2d 1246, 1249 (Pa.Super.1994) (third parties who establish standing by virtue of in loco parentis are not elevated to status of natural parent in determining merits of custody dispute); Com. ex rel. Patricia L.F. v. Malbert J.F., 278 Pa.Super. 343, 420 A.2d 572 (Pa.Super.1980).
J.A.L., at 1319 (footnote omitted). Our Supreme Court relied heavily on J.A.L. in its decision in this matter and must be construed to adopt the analysis above from *48 J.A.L. T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913 (2001).
¶ 17 Finally, this Court in J.A.L. reiterates our holding as to the standard to be applied vis a vis standing and the claim for partial custody as against the child’s biological parents.
We emphasize once again that our determination today does not change the standard applicable to J.A.L.’s claim for partial custody as against the child’s biological parent. J.A.L., although in loco parentis for standing purposes, remains a third party for purposes of evaluating her claim for partial custody. Kellogg v. Kellogg, [435 Pa.Super. 581, 646 A.2d 1246 (Pa.Super.1994) ].
J.A.L., at 1322, n. 7. Accordingly, third parties who establish standing by virtue of in loco 'parentis are not elevated to status of natural parent in determining merits of custody dispute.
¶ 18 With the above depiction of the applicable parameters and standards which apply in determining the best interests of the child with regard to visitation, there remains one additional category of evidentiary review which must be weighed by the trial court. The court must consider the factors as set forth in the UMDA Sections 402(4) and 402(5) and in 23 Pa. C.S. § 5303(a)(1). The UMDA requires a court to consider the child’s adjustment to his/her home, school, and community (§ 402(4)) and the mental and physical health of all individuals involved (§ 402(5)). Pennsylvania’s Domestic Relations Code provides, “[i]n making an order for custody or partial custody, the court shall consider the preference of the child as well as any other factor which legitimately impacts the child’s physical, intellectual and emotional well-being.” 23 Pa.C.S.A. 5303(a)(1).
¶ 19 The most problematic consideration before the trial court in weighing the above factors relates to the long if not excessive separation between A.M. and appellant, which vitiates any benefit which might have accrued to their relationship from in loco parentis status. Almost nine years have elapsed since any meaningful interaction has occurred between appellant and A.M., and continuation of the alienation and animosity by L.R.M. as to A.M. and T.B. having a meaningful relationship could render all other factors to a large degree meaningless.
¶20 The majority’s provision for vacation of the stay on visitation with reasonable implementation of a schedule, hopefully supervised and assisted by counseling, is the first step to bring about a fruitful resolution of this problem. The need to go forward with evaluations of the home and school environments must proceed as rapidly as possible without disturbing the child’s emotional and physical stability. There must also be an in depth review and evaluation of A.M.’s multiple allergy, asthma and quasi-psychological problems characterized as ADD/ADHD, which must be treated and considered while the attempt to install a visitation program is pursued.
¶ 21 Finally, after there has been a reasonable opportunity to create a visitation program, A.M.’s wishes concerning the visitation and her desire to continue with it must be evaluated. Throughout the process it is evident that court monitoring and counseling will be required to achieve any degree of well-being in the child’s best interest.

. Joseph Goldstein (Law School, Yale University), Anna Freud (Hampstead Child Therapy Clinic) Albert Solnit (Child Study Center, Yale University), Before the Best Interest of the Child and Beyond the Best Interests of the Child (The Free Press 1973, 1979).

. As this Court noted in In re Slaughter, 738 A.2d 1013 (Pa.Super.1999), our Supreme Court in Rowles v. Rowles, 542 Pa. 443, 668 A.2d 126 (1995) purported to abolish the presumption in favor of natural parents in custody determinations. "The Supreme Court has noted on numerous subsequent occasions, however, that the alleged abolishment was part of a plurality decision that did not command a majority of the justices. It is therefore not binding precedent and the rule of Ellerbe [v. Hooks, 490 Pa. 363, 416 A.2d 512 (1980)] remains in force in Pennsylvania.” Slaughter, supra, at 1018, n. 6.